## Commonwealth ex rel. Milk Control Commission v. Hollinger

*John J. Snyder*, for Pennsylvania Milk Control Commission.

*Mark E. Garber*, for appellant.

SHUGHART, P. J., April 19, 1951.—An information was brought by an agent of the Pennsylvania Milk Control Commission before a justice of the peace of this county charging defendant, William Hollinger, with having delivered milk to a customer on July 25, 26 and 27, 1949, in violation of section 2 of Official General Order No. A-191 of the Pennsylvania Milk Control Commission.

The order alleged to be violated is known as the "every other day delivery order" and provides that

milk dealers, handlers or distributors within the Harrisburg milk marketing area, area no. 8, are prohibited from delivering milk or milk products to the premises of a retail customer or consumer more often than once in a 48-hour period beginning 12:01 a.m. of each day.

Defendant was found guilty by the justice of the peace, who imposed a fine of $25 upon him. Subsequently this court granted defendant leave to appeal.

Following the appeal the facts were submitted to the court by stipulation of counsel. In the stipulation defendant admits: The existence of the order of the commission referred to above; that he did not take an appeal from the order within the statutory period; that he has not requested the commission to revoke or revise the order since its promulgation; that he sells milk within the Harrisburg milk marketing area, and finally, that he did deliver milk to the premises of a retail customer on the dates set forth in the information. The stipulation further provides that the official general order of the commission and the findings of fact and discussion in support thereof be included and made a part of the record for submission to the court.

Defendant admits the existence of all the facts in support of his conviction, but contends that section 2 of Order A-191 is void as being in contravention of the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania and that his conviction thereunder is therefore unjust. The matter has been argued and is now before the court for disposition.

Counsel for the commission first contends that the appeal should be dismissed on the ground that defendant cannot collaterally attack the order in a criminal prosecution for its violation. This position is predicated upon the general rule frequently enunciated by our courts that ". . . no one is entitled to judicial relief for a supposed or threatened injury until the pre-

scribed administrative remedy has been exhausted": Myers et al. v. Bethlehem Shipbuilding Corp., 303 U. S. 41, 50. Counsel for the commission relies principally upon the cases of Commonwealth v. Ziegler Dairy Company, 139 Pa. Superior Ct. 224; Commonwealth v. Jackson, 146 Pa. Superior Ct. 328, affirmed in a per curiam opinion by the Supreme Court, 345 Pa. 456.

In both of these cases the attack was on the reasonableness of the prices fixed for milk and *not upon the right of the commission to fix a price.* That the establishment of a minimum retail price was a valid exercise of the police power had previously been decided in Rohrer v. Milk Control Board, 322 Pa. 257, 186 Atl. 336. In the Jackson case, supra, the court said at page 334:

"Whether the commission violated the Constitution by exceeding the bounds of reasonableness, in establishing *the selling price of milk,* is a question which should have been raised at the hearing before the commission or by an appeal from that order. Without an appeal, as provided by the statute, the order became final and the *reasonableness of the rate* cannot be questioned collaterally." (Italics supplied.)

Defendant in the instant case contends that the commission lacked authority to issue not only the order in question but any order regulating the interval between deliveries. His attack is therefore not on the reasonableness of the order, but upon the authority of the commission to promulgate any order on the specific subject matter. If his contention is correct then the order is void for want of authority and not merely voidable on the grounds that the evidence on which the order was based was insufficient for one reason or another. In the Ziegler case where the attack was on the reasonableness of the price fixed the court held that there could be no defense to a prosecution for viola-

tion on the ground that the order was void because based in part on evidence not brought upon the record. The court said at page 233:

"While the term 'void' may have been loosely used in some of the cases it is evident that the action of the commission (in fixing a specific price) was erroneous or voidable rather than void, provided there was any substantial evidence in the record to support the order."

Had defendant here merely contended that the interval of 48 hours was unreasonable rather than an interval of 24 hours or some other period this decision would be controlled by the decisions cited by the commission. Such, however, is not his contention. He denies the authority of the commission to make any order on the subject matter.

In the Ziegler case, supra, the court said, at page 234:

"The case of Byers v. Hempfield Twp., 226 Pa. 278, 75 A. 415, also cited by appellant, draws a similar distinction as to when equity may be resorted to to restrain the collection of a tax and when not. It was there held that equity has jurisdiction to restrain by injunction an attempt by supervisors of a township to enforce collection of a tax which they have no power to impose; but if the rate or assessment was irregular, or had been unfairly or improperly imposed, or the valuation was too high, or the acreage assessed to the owners was too great, or for any similar reason was illegal, and an opportunity to appeal had been afforded, the owner would be compelled to resort for relief to an appeal."

If this appeal were dismissed as contended for by the commission it would mean that any order of the commission, even though it exceeded the authority of the commission and was therefore void, would have to stand unless an appeal was taken to the Court of Common Pleas of Dauphin County within 20 days of the

effective date of such order. Such is not the law of this great Nation nor of this Commonwealth.

The defense that an order of an administrative agency is void and unconstitutional because it exceeds the authority of the agency, as in this case, is one that may properly be raised as a defense to a prosecution for violation of the order. This principle is established by the decision in the Ziegler case, supra, and by the case of Rohrer v. Milk Control Board, 322 Pa. 257, in which the milk dealer, defendant, attacked the constitutionality of the Milk Control Act on an appeal to the Court of Common Pleas of Lancaster County from an order of the Milk Control Board.

Having decided that the order may be attacked in proceedings before us we turn to a consideration of the constitutionality of the order in question.

The constitutionality of the Milk Control Law of January 2, 1934, P. L. 174, was sustained by the Supreme Court of Pennsylvania in the case of Rohrer v. Milk Control Board, 322 Pa. 257.

A consideration of the propriety of the order of the commission prohibiting deliveries more often than once in every 48-hour period requires a consideration of the purpose and the evils sought to be remedied by the act and its amendment by the Acts of April 30, 1935, P. L. 96; April 28, 1937, P. L. 417; July 24, 1941, P. L. 443; June 4, 1943, P. L. 879; 31 PS §700j-101.

In the preamble to the Act of 1937 the legislature set forth legislative findings of fact with respect to the milk industry on which they based their conclusion that the industry was a business affected by a public interest. A summary of these factors, together with a history of the industry, was set forth in the dissenting opinion of President Judge Keller of the Superior Court, whose opinion was adopted as the majority opinion of the Supreme Court in the Rohrer case, supra. He said, beginning at page 264:

"In the early days of our existence as a State, even in town and urban communities, it was not uncommon for householders to keep their own cow, and the distribution and supply of milk was a comparatively simple matter, largely local in scope and operation. Today it is expanded so as to be state-wide and even interstate in character. Exacting regulations looking to the public health have already been enacted, which greatly increase the cost of production. Practically no milk is produced for private consumption in town and city, and dairy farming has become a widespread industry, subject already to much regulation and inspection, on which the health and well-being of the people is largely dependent. The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself because (1) milk cannot be kept by the producer but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish and is hedged about by a host of sanitary regulations, for the protection of the public, because it is a most fertile field for the growth of bacteria. *These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the legislature intervenes for his protection; not primarily for his benefit, but only*

*secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer and the producer.* The collection, transportation, distribution, and supply of dairy products has gravitated into the hands of a comparatively few dealers, as compared with former conditions. *One of the results of the process has been to lower the return to the producer so that in many cases it is less than the cost of production, and commonly does not afford him reasonable compensation for his labor nor a fair return on his invested capital. A prolonged continuance of this condition would necessarily result in cutting down the herds of dairy cows, with a consequent shortage of product and corresponding high or exorbitant prices in a commodity absolutely essential for the health and well-being of our people, especially young children.*" (Italics supplied.)

And further at page 273:

"So, in this case, in the opinion of the legislature, no permanent removal of the conditions which threaten the general public can be secured until a more equitable division is made of the money paid by the consumer, and a larger and more stable proportion is secured to the farmer and producer."

Despite the strong reasons set forth above there existed a lack of unanimity in the opinions of the courts sustaining the constitutionality of acts controlling the milk industry. In a decision rendered prior to that in the Rohrer case the Supreme Court of the United States in a 5-to-4 decision in the case of Nebbia v. New York, 291 U. S. 502, 78 L. Ed. 940, sustained the constitutionality of a New York law regarding milk control, said by Judge Keller in the Rohrer case, supra, to be "identical in essential respects" to the Pennsylvania act.

Under these circumstances we must carefully consider the matter of regulation of deliveries in the light of the reasons in support of the declaration that the milk industry is a business affected by a public interest and determine whether the regulation in question is reasonably calculated to remedy the evils found to be existing.

In so doing it must be borne in mind that the burden of proof in such cases rests upon the person assailing the constitutionality of an order or statute, and that there is a strong presumption in favor of the validity of legislative action and where there is doubt the decision must be in favor of validity: Rohrer v. Milk Control Board, supra; Commonwealth v. Lukens, 312 Pa. 220; Keater v. Lackawanna County et al., 292 Pa. 269. Further, the fact that where, as here, a State regulation is questioned the question becomes: Has the State been forbidden by either the Federal or State Constitution to legislate on the subject?: Rohrer v. Milk Control Board, supra.

The order of the milk commission under consideration was adopted on April 24, 1946, and made effective May 1, 1946. The matter of every other day deliveries was, however, regulated prior to the effective date of the present order, as appears from the opinion of the Supreme Court in the case of Commercial Drivers Conference et al. v. Pennsylvania Milk Control Commission et al., 360 Pa. 477, 479:

"During the war the federal Office of Defense Transportation, *as a measure of conservation,* limited retail milk deliveries to every-other-day deliveries and prohibited special deliveries and wholesale Sunday deliveries. After termination of the federal regulations, the Pennsylvania Milk Control Commission on November 1, 1945, published orders continuing these restrictions. The original orders of the Commission became effective November 1, 1945, and expired on April 30,

1946. Prior to expiration the commission held a hearing to determine the advisability of continuing the orders. . . ."

"Official General Order No. A. 184, the order now before the court, was issued by the commission, continuing for an indefinite period restricted milk deliveries in the Philadelphia Milk Marketing Area. *The reasons for this order seem to have been the continued existence of equipment shortages and the decrease in cost to distributors (and also to the consumer) resulting from restricted deliveries."* (Italics supplied.)

(In this case appellants were the Board of Governors of the Pennsylvania Commercial Drivers Conference who, in behalf of themselves and others similarly interested, sought to intervene and filed an appeal in the Dauphin County court from the promulgation of the every-other-day delivery order of the commission, which affected the Philadelphia marketing area. Both the lower court and the Supreme Court held that appellants were not "persons aggrieved" by the order and hence had no right to intervene. The question of the constitutionality of the order was therefore not decided by the court.)

It appears, therefore, that although the commission has been in existence since 1934 it promulgated no rules respecting deliveries prior to the expiration date of the orders of the Federal Office of Defence Transportation. Although we are not concerned with the validity of the order of the O. D. T. we recognize that that regulation was promulgated in an effort to conserve gasoline and rubber, two items vital to the production of materials for the successful prosecution of the war in which we were then engaged. The reasons supporting the Federal regulations terminated with the cessation of hostilities, hence the regulation was lifted a few months later. These reasons having been

removed as respecting Federal regulation they are not now available to support regulation by the Pennsylvania Milk Control Commission; nor has the commission advanced these reasons to support the present regulation at argument.

The findings of fact made by the commission following the hearings before the order was adopted disclose that the principal reason in support of the regulation was that through and by it milk could be sold to the ultimate consumer at lower cost. The commission found as facts that: (1) The resumption of every day delivery would require additional vehicles and other equipment; (2) the every-other-day delivery results in saving distribution costs, which can permit the sale of milk to consumers at a lower cost; (3) every-day delivery would involve additional cost not only in delivery to retail consumers, but also in deliveries to wholesale consumers and in special deliveries; (4) every-other-day deliveries results in more efficient use of equipment in that vehicles carry a larger number of units; (5) indirect costs of delivery, workmen's compensation, social security taxes and similar costs will be reduced by every-other-day delivery.

In the discussion following the commission's findings the following statement appears:

"Reference was made by one witness to a study that had been made in New York City which showed that the cost of delivering milk to retail consumers would be increased to 1.3 cents a quart if the prewar type of delivery service is resumed."

The commission seems to contend in substance that since they have been granted the authority by the legislature to regulate the price and delivery of milk they have the power to regulate the delivery in such manner as to secure for the consumer the lowest possible price.

The reduction of the price of goods and produce is a result which all of us as consumers regard as a laudable undertaking; however under our form of government this end must be achieved through the application of the law of supply and demand as it is affected by competition among those who would supply the particular goods to us, except in those businesses which have been declared to be affected by a public interest. In our land free enterprise, save for time of emergency, is the general rule, governmental control the exception. Therefore, although it is desirable that milk be available to the consumer at the lowest possible price it can scarcely be contended that it is more desirable to reduce the price of milk to its lowest price than to likewise reduce the price of other foodstuffs such as meat, vegetables, potatoes, or clothing. Though there is Biblical authority for the statement, "Man shall not live by bread alone" (Matthew 4:4), certainly bread is one of the principal foodstuffs of civilized races throughout the world, yet its production and distribution is free from governmental regulation. (Such was not always the case however; see Munn v. Illinois, 94 U. S. 113, 125, 132, ch. 845, 9 Stat. at L. 387-390.)

In brief, the reasons supporting the control of the milk industry were as set forth in the words of the legislature in the preamble to the act:

"Milk producers are subject to fraud and imposition, and do not possess the freedom of contract necessary for the procuring of cost of production."

It was because there was danger that the production of milk might cease altogether, to the great detriment of the citizenry, that prompted the legislature to act, not simply that the cost of the product was too great to the consumer. If by the regulation imposed the producer was encouraged to produce, by being assured a fair return for his product and the distributor or dealer prevented from realizing an excessive profit,

competition would assure the public of an adequate supply of milk, the result sought to be accomplished. These objectives were accomplished by fixing minimum prices to be paid to the producer and fixing maximum prices to be charged to the consumer.

The commission has promulgated the every-other-day delivery order on the finding that it resulted in a lower price of milk to the consumer and by this finding in the present action we are bound. In its discussion the commission, however, states:

"A regulation of an industry must be held within reasonable limits, and there are certainly many facets of a dealer's business which lie within the field of management rather than regulation."

There are many things which have a direct effect upon the ultimate cost of milk. Certainly one of the things having the greatest effect upon the cost of milk is the labor costs of the dealer, the hourly rate he pays his employes, both those engaged in processing and those making the actual deliveries. A change in this hourly rate would certainly affect the price of milk. How deliveries are made, whether by horse drawn or motor transportation, would likewise have some effect on the cost. We believe a finding, for example, that deliveries near the dealer's establishment, entailing frequent stops, could be performed more economically by horse drawn vehicle, might well be supported by evidence produced at a hearing. The size and type of containers employed, likewise, deserve consideration in any determination of cost of delivery and consequently the price charged, as well as many other items. Finally, if the distributing areas were divided among the dealers so that the deliveries of each would be in a confined or restricted area undoubtedly the delivery costs would be reduced. Certainly the present system whereby the several dealers make deliveries each to

his own customers in the same block is less efficient and less economical than for one to serve all such customers.

Likewise, the adoption of particular practices by the producers could well be found to result in a lowering of the cost of production, a resultant lowering of the minimum, and consequently a lowering of the maximum price of milk. Certainly the cost to the producer to deliver several hundred pounds of milk to the receiving station is no more than to deliver one hundred pounds if he utilizes his own vehicle. The things fed to dairy cattle differ greatly in kind, quality and price. The use of some undoubtedly result in a lower production cost. We believe, for example, that it is well established that milk can be produced more economically by the use of feeds produced by the dairyman on his own farm rather than by feeds purchased. Lastly the labor cost of the producer is an item which figures heavily in his costs.

Does the fact that all the matters above mentioned have a bearing upon the ultimate cost of milk render them subject to regulation? If not, in what way would regulation of such matters differ from the order prescribing every-other-day deliveries? The regulation of none of the things referred to would tend to correct the fraudulent practices which the legislature found to be threatening to destroy the milk industry, nor does in our opinion the order directing deliveries only every other day.

One of the appellant's principal objections to the regulation is that the order adversely affects the volume of his business. He contends that while he is prevented from delivering to his customers every day, his competitors under the regulation can lawfully deliver to the same customer on the day the appellant is prevented from so doing. Where this occurs it naturally would result in appellant receiving approximately one half of his customer's business. While no testi-

mony was introduced to prove this contention, we are bound to note that such practice is not prohibited by the regulation. At oral argument the only relief suggested to appellant by counsel for the commission was that he go forth and do likewise to his competitor.

While the regulation prevents a distributor from delivering oftener than every-other-day there is nothing to prevent the customer from receiving deliveries every day. There is therefore no violation of the order if there are every-day deliveries so long as they are not made by the same dealer. The fact that much of the milk is consumed by families with children, many unquestionably without adequate refrigeration storage facilities, leaves little doubt that many of them are in fact receiving deliveries every day. To sustain the regulation they must in effect be told that they may within the letter of the law continue receiving milk every day so long as it is not from the same distributor. It would certainly seem that the only way that the reduction in costs could be effectively brought about by such order would be to have it prohibit the receipt of deliveries by the customers more often than once every other day. If this is so then the order in question does not have a real and substantial relation to the objective sought to be attained and is therefore invalid: Nebbia v. New York, 291 U. S. 502; Rohrer v. Milk Control Board, supra.

If the various dealers are able to cross into each other's territory on the off-days and make delivery of milk at the present fixed prices and still realize a profit, the evidence that the cost of milk would be increased by a return to every day delivery is considerably weakened. Such a determination is not however within our province in this case.

In Nebbia v. New York, 291 U. S. 502, Justice Roberts speaking for the court said:

". . . the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and *that the means selected shall have a real and substantial relation to the object sought to be attained.*" (Italics supplied.)

And again:

"Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

In the Rohrer case, 322 Pa. 257, 277, the court said:

"It (the legislature) has set forth in plain and unmistakable language the basic purposes and primary standards which it has in mind *in an attempt to remedy the mischievous conditions which are present in the milk industry,* a continuance of which threatens the welfare and well-being of the whole people; and having done so it may lawfully appoint the board its agent upon whom devolves the duty *to carry out the legislative policy.* It has not delegated its power to make law, but has delegated the power *to determine facts and apply the intention of the legislature to conditions thus determined.*" (Italics supplied.)

In the same opinion at page 276 it was stated:

"It is primarily for the legislature to consider and decide on the fact of a danger, then meet it by a proper remedy: Stafford v. Wallace, 42 U. S. Supreme Ct. Rep. (issue of June 9, 1922), 397, 401. Of course, the cure *must always bear a substantial relation to the existing evil,* and must not constitute a mere attack on property rights, disguised as an exercise of the police power."

The evils to be corrected by the Milk Control Act are the conditions described at length in the preamble and in the opinion of Judge Keller in the Rohrer case above set forth. For the reasons given we believe it is

clear that the every-other-day delivery order does not bear a substantial relation to that evil and the order is therefore invalid.

Although the discussion of the commission attached to the factual findings in support of the order indicates that the cost of delivering milk in New York City would be increased 1.3 cents a quart by a return to pre-war type delivery, counsel has neglected to advise us if the New York Commission has promulgated an order similar to the one in question. Likewise no cases from any State have been cited to us nor has our search revealed any in which the validity of an order similar to the instant one has been sustained.

In a case cited by counsel for appellant, Cloutier v. State Milk Control Board, 92 N. H. 199, 28 A. (2d) 554, decided October 6, 1942, the Supreme Court of New Hampshire upheld an every-other-day delivery order promulgated by the New Hampshire Milk Control Board which had power to regulate the distribution of milk. That order had, however, been promulgated during war time and was designed to conserve rubber and gasoline. It was specifically restricted in its application by the court to deliveries by motor vehicles. The court said, at page 205:

"As to deliveries by means of transportation other than motor vehicles or vehicles equipped with rubber tires, any order forbidding daily distribution is deemed null and void. An order must relate to the purpose which the act seeks to accomplish and must be of a character which the act permits."

Although the exact provisions of the New Hampshire act may differ from those of our own statute, the reasoning of the court is, we believe, equally applicable.

Since the order for the violation of which defendant was convicted is invalid, his appeal must be sustained.

And now, April 19, 1951, the appeal is sustained, and defendant, William Hollinger, is found not guilty. Costs to be paid by the County of Cumberland.